UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PAMELA TOBIAS for D.T., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06 CV 1706 CAS |
| ) | DDN |
| MICHAEL J. ASTRUE,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff D.T. for childhood supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381 et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision denying benefits be reversed.

**I. BACKGROUND**

Plaintiff D.T. was born on November 30, 1988. (Tr. 12.) He is 5'10" tall with a weight that has ranged from 177 pounds to 185 pounds. (Tr. 12, 59.) D.T. was 17 years old and in 11th Grade at the time of the hearing, taking special education classes in history and government. (Tr. 12, 209.) He was in a "work prep" program in school, but was not paid for the work. He was living with his mother, her boyfriend, and his two brothers, ages 15 and 13. (Tr. 12, 209.)

On July 12, 2004, D.T. applied for disability benefits, alleging he became disabled on August 1, 1993, because of learning impairments

---

[1] Jo Anne B. Barnhart was the original defendant. Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as defendant in this suit. 42 U.S.C. § 405(g).

and depressed speech and behavior. (Tr. 37, 60.) The application was denied on October 8, 2004. (Tr. 39.) Following a hearing on April 3, 2006, the ALJ denied benefits on April 25, 2006. (Tr. 10, 16.) On October 3, 2006, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3.) D.T. had applied for disability benefits four previous times, on March 25, 1994, January 30, 1995, June 3, 1996, and June 9, 1998. Each application was denied. (Tr. 12, 27.)

## II. MEDICAL HISTORY

In an undated report, Susan Streck noted D.T.'s academic difficulties. He had difficulty in basic reading comprehension, written expression, especially sentence and paragraph writing, and struggled to understand the English language. (Tr. 149.)

In an undated report, a diagnostic team certified that D.T. required special education. These "disabilities" were not linked "to emotional disturbance, mental retardation, dialectal differences . . . or deficits in the areas of visual acuity, auditory acuity, or motor functioning." (Tr. 152.)

While in either 1st Grade or Kindergarten, D.T. was noted to have a learning disability affecting his basic reading skills and written expression. D.T. also had a language impairment in syntax, semantics, and morphology. D.T. scored a 78 on the Wechsler Intelligence Scale for Children (WISC), indicating borderline to low average range of cognitive ability. (Tr. 151.)

Sometime in 1995, a psychiatrist prescribed D.T. Ritalin for attention deficit disorder. The Ritalin made D.T. sick and his dosage was lowered. The lower dosage continued to make D.T. sick and his mother had him stop taking it. In her words, he was "spaced out like a zombie" while on the medication. (Tr. 31, 33.)

On March 5, 1996, Jane Avery tested D.T.'s IQ. D.T. had a composite IQ of 86 on the Stanford-Binet test; a score between 89 and 110 represents the average score. D.T. had a verbal IQ of 79 (8th percentile), a performance IQ of 81 (10th percentile), and a full scale IQ of 78 (7th percentile) on the WISC test. D.T. scored a 73 (4th

percentile) on the Beery Developmental Test of Visual Motor Integration. His developmental age was noted as 5 years 2 months; he was 7 years, 3 months old at the time. (Tr. 138-39.)

On April 30, 1996, Laura Schmidt administered the Woodcock-Johnson Achievement Test. D.T. received a score of 77 in broad written language (6th percentile), 66 in basic writing skills (1st percentile), and 70 in written expression (2nd percentile). D.T. also took the Wechsler Individual Achievement Test (WIAT), and received a composite score of 75 in reading (5th percentile), a composite score of 83 in mathematics (13th percentile), and a score of 92 in listening comprehension (30th percentile). (Tr. 140-41.)

On June 21, 1996, Dr. Robert L. Korn, M.D., examined D.T. On the day of the examination, Dr. Korn did not find any obvious attention deficit disorder during the exam. (Tr. 31.)

On July 23, 1998, Arthur Littleton, Ph.D., examined D.T. and found no discernable problem with either receptive or expressive domains. D.T. was able to follow simple routine instructions, and did not exhibit any psychomotor restlessness, agitation, or hyperactivity. Dr. Littleton administered the WISC test and found D.T. had a verbal IQ of 81, a performance IQ of 74, and a full scale IQ of 76. Dr. Littleton found D.T. had given a good effort and considered the results valid. Dr. Littleton diagnosed D.T. with borderline intellectual functioning and no other clinically significant psychological impairment. He did not believe D.T. had a learning disorder. (Tr. 32.)

On August 6, 1998, a speech and language pathologist examined D.T. The pathologist noted an improvement in D.T.'s speech, and found his articulation and fluency skills were within normal limits. D.T. passed an audiometric screening and the pathologist believed any articulation substitutions were dialectal variations. The pathologist found D.T. demonstrated a severe language delay, particularly in his expressive language skills and recommended continuing speech and language services. (Id.)

On May 26, 1999, the ALJ evaluated D.T.'s previous request for childhood SSI. The ALJ found D.T. had marked limitation of function in the cognition/communication area of development, but no limitation in

motor functioning. The ALJ also found no limitation in the personal area of functioning, and a less than marked limitation in the concentration area of functioning. There was no evidence of an oral mechanical problem. The ALJ found D.T.'s speech impairment was not a separate impairment from his low intellectual functioning. His articulation was within normal limits and he could repeat the alphabet and the numbers 1 through 20 without any mispronunciations. Because D.T. did not have extreme limitation in one area of functioning, or marked limitation in two areas of functioning, the ALJ concluded D.T. was not disabled within the meaning of the Social Security Act. (Tr. 27-36.)

On January 23, 2002, the Individualized Education Program (IEP) team agreed that D.T. should continue to receive special education. The IEP team found D.T. was learning disabled in basic reading and written expression, and was language impaired. Because of these impairments, D.T. required directions and concepts to be repeated and rephrased, tests to be read and paraphrased, help with note-taking, and extra time to complete tests and assignments. D.T. showed strength listening in class and asking for help when needed. He enjoyed math and was willing to read aloud when one on one. Since his last IEP assessment, D.T. had increased time in general education classes. He had grades of C+ and C in Science, B- and C (due to effort) in Math, and C and C in Unified Studies. D.T. received 255 minutes a week in special education instruction for written expression, basic reading, and test/assignment completion. He also received 375 minutes a week of special education speech/language therapy and 225 minutes a week of general education speech/language therapy. He was in the 7th Grade. (Tr. 133, 156-68.)

On November 4, 2003, Suzanne Reuman, D.T.'s Special Education Teacher and IEP Case Manager, noted her observations. D.T. was learning disabled in basic reading and written expression, and had a language impairment. Because of these impairments, D.T. was receiving special education classes in reading and written expression. D.T. performed well in math, maintaining a C average in the general education class, though he was on "modified credit" for his regular classes. He had above average grades in the special education classes. D.T. had three

classes in special education, three classes in general education, and one study hall. D.T. received 825 minutes a week in special education instruction for written language skills and basic reading. He also received 50 minutes a week of language therapy. Reuman recommended decreasing D.T.'s time in special education "due to success in regular education." Reuman believed D.T. could successfully maintain passing grades with reduced special education services. She based this belief on progress reports, D.T.'s grades, and previous IEP evaluations. (Tr. 118-31.)

During the 2003-2004 school year, D.T. received grades ranging from D to A. The majority of his grades were grades of B and C. The comments on his report card included remarks as "demonstrates good effort," "shows improvement," "participates well in class," "easily distracted in class," "disruptive," "does not work to potential," "does not complete assigned work," "poor homework quality," "inconsistent performance," "struggles with basic concepts," "socializes too much," "sometimes comes to class without materials," "excessive tardiness," and "does not use time wisely." (Tr. 204-05.)

Only July 12, 2004, Pamela Tobias completed a function report for D.T. She noted D.T. required glasses but had no problems hearing. His daily activities were not limited, nor was his ability to communicate. His physical abilities were also not limited. Pamela Tobias noted a number of intellectual limitations. D.T. could not read and understand stories in books, magazines, or newspapers. He could not read and understand sentences in comics and cartoons. He could spell words of more than four letters, could add, subtract, multiply, and divide with numbers greater than ten, understood money, and could carry out and remember simple instructions. D.T. could not tell time. His ability to pay attention and stick to a task were also limited. He was not able to complete his homework or complete it on time, complete chores, keep busy on his own, work on projects, or finish things he started. (Tr. 65-72.)

Because of his intellectual limitations, Pamela Tobias noted D.T. had trouble getting along with his siblings, his teachers, and other adults. He had trouble playing team sports with other children, but was

able to make friends his own age.  D.T.'s ability to care for his personal needs and safety were not affected by his impairments.  (Tr. 70-71.)

On July 26, 2004, Pamela Tobias completed a daily activities report for the Missouri Department of Elementary and Secondary Education.  In the report, she noted D.T. had a learning disability and language impairments.  D.T. was very easily distracted, and she would have to watch him to make sure he completed tasks.  D.T. also had to be told "how to do things over and over again."  His memory and attention span were very short.  Other children would not play with him because he could not keep up with them.  D.T. spoke clearly and other people were able to understand him.  Tobias noted D.T. was a slow learner, and had problems adapting.  (Tr. 74-78.)

On August 24, 2004, Sherman Sklar, M.E., a licensed psychologist, performed a psychological evaluation of D.T. at the Forest Park Medical Clinic.  He noted D.T. had problems concentrating, became frustrated quickly, and suffered from a short attention span.  As a result, his behavior would become disruptive and non-productive.  At home, he would fight with his siblings and sometimes sit in his room and stare at the wall.  D.T. said he had a good relationship with his cousin.  D.T. has never been hospitalized for behavioral problems and has not been on medication for a while.  During the examination, the speed of D.T.'s communication was good, and the quantity and quality of his verbalizations were good.  D.T. did not show any signs of thought disorder and his memory was good.  D.T. noted he was a bit of a loner. (Tr. 181-84.)

Sklar administered the WISC test, and found D.T. had verbal IQ of 59, a performance IQ of 66, and a full scale IQ of 60.  All of these scores are in the mentally retarded range.  However, during the test, D.T.'s frustration tolerance was very low, which "led to deficits in his productive output, his thinking, problem solving and checking of his answers."  As a result, Sklar believed the scores understated D.T.'s learning capabilities.  "The scores are not true measures of his learning capabilities, but rather reflect the affects of his attention deficit hyperactivity disorder."  Sklar did not believe D.T. produced

the low scores on purpose. Sklar strongly recommended medication to improve D.T.'s learning disabilities. And with or without medication, Sklar believed D.T. would need special education classes to make it through school. He diagnosed D.T. with attention deficit hyperactivity disorder (ADHD) and mild mental retardation, though with medication he believed D.T. would score in the borderline range. He assigned D.T. a GAF score of 55.[2] (Tr. 184-86.)

On September 23, 2004, Jennifer Henkhaus, M.A., CCC/SLP, of City Speech, Inc., administered the Clinical Evaluation of Language Fundamentals (CELF) test, to assess D.T.'s strengths and weaknesses in semantics, morphology, syntax, and memory. D.T.'s scores revealed a severe receptive language impairment and moderate expressive language impairment. In particular, D.T. demonstrated difficulty repeating sentences verbatim, formulating grammatical and complete sentences when provided with a word to use, understanding vocabulary, and answering problem-solving questions. Henkhaus did not test for articulation, finding D.T. was completely intelligible and logical in both known and unknown contexts. Voice and fluency skills were not areas of concern, and his hearing appeared to be within normal limits. (Tr. 188-89.)

On October 7, 2004, Judith McGee, Ph.D., reached a similar conclusion, diagnosing D.T. with a severe receptive language disorder and a moderate expressive language disorder.[3] She also found D.T. suffered from ADHD. McGee found the impairments were severe, but did not meet or functionally equal the listings. (Tr. 198-99.)

---

[2]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 55 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[3]The signature page is barely legible. Dr. McGee appears to be the examining consultant. (Tr. 199.)

On November 1, 2004, Suzanne Reuman noted her observations of D.T. D.T. was diagnosed as learning disabled in basic reading and written expression, and these impairments negatively affected his ability to participate in general education. At the time, D.T. was failing several classes. His mother said he would not bring his homework home. There were no significant changes in D.T.'s learning disability and language diagnosis from the last assessment. Since August 2004, D.T. had become more resistant to receiving assistance. D.T. received 550 minutes a week in special education instruction for written language skills and basic reading. He also received 50 minutes a week of language therapy. D.T. was to continue to receive special education classes. (Tr. 101-14.)

On November 4, 2004, Pamela Tobias completed a disability report appeal form. She noted there were no changes in D.T.'s condition, but reiterated that D.T. had trouble staying focused and trouble keeping up with children his age. (Tr. 79-85.)

On October 31, 2005, Suzanne Reuman noted her observations of D.T. D.T. had weak grammar and proofreading skills, writing mechanics, reading skills, and paragraph writing skills. D.T. also dealt with low self-esteem, lack of motivation, and poor self-advocacy. Reuman found D.T. had good basic math skills and could comprehend and recall information. D.T. was in the 29th percentile in math, based on a Terra Nova Achievement test. She believed D.T. would benefit from an extra day to complete assignments. D.T. received 550 minutes a week in special education instruction for written language skills and basic reading. He also received 30 minutes a week of language therapy. (Tr. 87-99.)

**Testimony at the Hearing**

D.T. testified during the hearing on April 3, 2006. He explained that he was taking special education, or IEP classes, in history and government, and also participated in a work prep program for credit. He was taking the IEP classes because of an "inability to focus right in regular class," and because he would sometimes need concepts explained or read to him. He did not believe any medical problems would

keep him from working.  He could add, subtract, and multiply, but needed a calculator for division or fractions.  He could not read a newspaper and had failed the written portion of the driver's license test four times previously.  He had no physical problems with sitting, standing, or walking, but had trouble remaining seated for extended periods (due to concentration, not pain).  He had no problems with personal care.  D.T. said he was scared of the dark and usually slept in the morning.  (Tr. 207-15.)

Pamela Tobias testified on behalf of her son.  She would meet his teachers every year to discuss the IEP program.  At the time of the hearing, D.T. was not on any medication and since being involved in the work prep program had not had any disciplinary issues.  (Tr. 215-17.)

### III.  DECISION OF THE ALJ

On April 25, 2006, the ALJ found D.T. was not disabled within the meaning of the Social Security Act.  (Tr. 10.)  The ALJ began by summarizing the applicable law and regulations relating to child disability cases.  (Tr. 11.)  The ALJ then summarized D.T.'s prior applications for disability benefits.  Most recently, the ALJ had denied an application for benefits on May 26, 1999.  (Tr. 12.)

The ALJ found no good cause to disturb the earlier decision.  The ALJ only considered evidence after May 26, 1999.  The ALJ first noted that D.T. had no significant physical impairments, passing all vision, hearing, and motor skills testing and screening at his school.  None of the examining or treating doctors ever found a physical disability.  (Tr. 13.)

The ALJ also found D.T. did not have a mental disability.  D.T. had taken annual evaluations in his school, from April 2001 to October 2005.  He was in a learning disorder program 21% to 50% of the time for reading, written language, and a language syntax impairment.  He was given extra time to complete tests and was in language therapy classes thirty minutes each week.  No evidence suggested he presented significant disciplinary problems.  In the 2003-2004 school term, D.T. received grades ranging mainly from A to C, with a few Ds, and no Fs.  (Id.)

In reaching this decision, the ALJ discounted the WISC scores found by Sherman Sklar. Since there was no evidence of any brain disease or brain trauma, which would explain decreased intelligence, the ALJ concluded "the earlier and higher scores are the more accurate ones." According to the ALJ, "[c]ommon sense dictates that one cannot manifest a higher degree of intelligence than what he possesses . . . ." The ALJ also noted that Sklar believed D.T. could function at the borderline level if he resumed medication. Finally, the ALJ discounted Sklar's diagnosis of ADHD, since there was no documented evidence from the school of any ADHD within the past five years. Regardless, the ALJ believed the ADHD could be controlled with medication. (Tr. 14.)

The ALJ found nothing wrong with D.T.'s speech, either in terms of logic or intelligibility. Any difficulty in D.T.'s speech concerned language use and mastery. The ALJ found no valid reason to support D.T.'s lack of medical treatment, and attributed any absence of treatment to the claimant's (or his mother's) belief that such treatment was not needed. Aside from a limited intelligence, the ALJ found D.T. had no credible, medical limitations "in terms of being able to pay attention and absorb information, behave properly and get along with others, and maintain normal motor skills and self-care." (Tr. 14.)

At worst, the ALJ found D.T. had a marked limitation in acquiring and using information because of his borderline intellectual functioning and syntax disorder. The ALJ found D.T. had less than marked limitations in attending to and completing tasks, and interacting and relating with others. D.T. had no limitations in moving and manipulating objects and caring for himself. The ALJ concluded the allegations of extreme functional limitations were not credible, and found D.T. not disabled. (Tr. 14-15.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the

Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. § 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. § 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 416.920(a)(4).

Here, the Commissioner determined that D.T. was not disabled.

## V. PLAINTIFF'S GROUNDS FOR RELIEF

D.T. argues the ALJ failed to consider all of his impairments. Specifically, D.T. argues the ALJ failed to properly consider Sherman Sklar's diagnosis of ADHD. D.T. also argues that the ALJ failed to articulate a sufficient rationale in concluding he did not have marked impairment in the areas of attending to and completing tasks, and interacting and relating with others. (Doc. 15.)

## VI. DISCUSSION

If a child has a severe impairment or combination of impairments that does not meet or medically equal any listing, the Commissioner will decide whether the plaintiff has limitations that "functionally equal the listings" of disabling conditions promulgated by the Commissioner. See 20 C.F.R. § 416.926a(a). To functionally equal the listings, the

impairment or impairments must be of listing-level severity.  Id.  In other words, to be entitled to benefits, the claimant's impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning.  Id.; Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003).

There are six domains of functioning: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  An extreme limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities  20 C.F.R. § 416.926a(e)(3).

When evaluating a claimant's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions.  What activities is the child able to perform?  What activities is the child unable to perform?  Which of the child's activities are limited or restricted compared to other age-equivalent children who do not have impairments?  Where does the child have difficulty with activities - at home, in childcare, at school, or in the community?  Does the child have difficulty independently initiating, sustaining, or completing activities?  What kind of help does the child need to do activities, how much help is needed, and how often is it needed?  20 C.F.R. § 416.926a(b)(2)(i)-(v).

These questions are not, singularly or as a whole, the only factors useful to determine whether or not a child has a "marked" or "extreme" limitation.  20 C.F.R. § 416.926a(e)(2)(4)(i).  If applicable, test scores can be used in combination with other factors, observations, and evidence to determine the level of impairment.  Id.  "Marked" or "extreme" limitations as defined by test scores are not automatically conclusive if additional evidence in the record shows a pattern of behavior inconsistent with those scores.  See 20 C.F.R. § 416.926a(e)(4).

**ADHD Diagnosis**

In 1995, a psychiatrist prescribed D.T. Ritalin for attention deficit disorder. The Ritalin made D.T. sick and his mother had him stop taking it. In August 2004, Sherman Sklar, a licensed psychologist, diagnosed D.T. with ADHD and strongly recommended medication to improve his learning disabilities. In October 2004, Judith McGee, Ph.D., also diagnosed D.T. with ADHD.

The evaluation by Dr. McGee included only a summary of D.T.'s impairments. In his decision, the ALJ did not discuss Dr. McGee's evaluation. The ALJ discussed Sklar's ADHD diagnosis, but discounted it, since there was no documented evidence from the school of any ADHD within the past five years. The ALJ also believed any ADHD could be controlled with medication.

The conclusion of the ALJ regarding the ADHD issue is not supported by substantial evidence. A number of individuals participated in the IEP meetings with Pamela Tobias, including D.T.'s special education teacher, Suzanne Reuman, his general education teacher, a component district representative, and a special school district (SSD) representative. In each case, Suzanne Reuman appears to have been charged with interpreting D.T.'s IEP evaluations. (Tr. 87, 101.) However, there is no evidence these individuals had the training or specialization to formally diagnose ADHD. On the other hand, between 1995 and 2004, three separate psychologists or psychiatrists diagnosed D.T. with some form of attention deficit disorder. See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (noting the "Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); see also 20 C.F.R. § 416.927(d)(5) (same). In addition, Pamela Tobias indicated D.T. was unable to take Ritalin. The ALJ therefore erred by discounting Sklar's diagnosis of ADHD.

**Attending and Completing Tasks**

The ALJ found D.T. "possibly has less than marked limitations in attending to and completing tasks . . . ." (Tr. 14-15.) This finding

-13-

is not supported by substantial evidence. The IEP team noted D.T. was learning disabled. Because of these impairments, D.T. needed directions and concepts to be repeated and rephrased, help with note-taking, and extra time to complete his tests and assignments. The comments in his report card reinforce D.T.'s inability to concentrate on the tasks before him. D.T. was noted as "easily distracted in class," and "disruptive." Other teachers noted he "does not complete assigned work," "struggles with basic concepts," and "does not use his time wisely." Only his English teacher found "he participates well in class."

His mother also complained of his inability to complete tasks. He was not able to complete his homework or complete it on time. He was unable to complete his chores, keep busy on his own, or finish things he started. D.T. had a short memory and attention span, and had to be told "how to do things over and over again." She found D.T. was very easily distracted and had to be watched to ensure he completed tasks. In his examination, Sklar found D.T.'s inability to focus and concentrate skewed his test scores into the mentally retarded range. Sklar found D.T. suffered from a short attention span, became frustrated quickly, and had problems concentrating. Ultimately, he diagnosed him with ADHD. Dr. McGee also diagnosed D.T. with ADHD. In the more recent IEP evaluations, Reuman found D.T. had become more resistant to receiving assistance and showed lack of motivation. She recommended giving D.T. an extra day to complete assignments. At the hearing, D.T. said he could not sit and remain seated for extended periods. He was "[a]lways getting up walking around. Always talking and reading." (Tr. 211.) D.T. also explained that he was in IEP classes because of his "inability to focus right in regular class."

The ALJ did not make any express credibility determinations. He found the allegations of marked limitations not fully credible, but never found any individual statements or observations of D.T. or his mother to be false or exaggerated. In administering the WISC test, Sherman Sklar did not believe D.T. had purposely tried to score low. He found D.T. to be well motivated, but simply unable to follow through on his motivation because of his short attention span. (Tr. 185.)

There is no evidence in the record of D.T. maintaining his focus or completing tasks on time. Based on the record, D.T.'s impairments, at the least, seriously interfered with his ability to attend to and complete tasks. D.T. had at least marked limitations in this domain and substantial evidence does not support a finding to the contrary.

**Interacting and Relating with Others**

The ALJ found D.T. "has less than marked limitations . . . in interacting and relating with others . . . ." Substantial evidence supports this decision. In a function report, D.T.'s mother noted he was able to make friends with children his own age. In his report card, one of the teachers indicated D.T. socialized too much. Sherman Sklar found D.T. would fight with his siblings, but had a good relationship with his cousin. D.T. did not appear to have any significant behavioral problems, though he described himself as a bit of a loner.

D.T.'s mother noted he spoke clearly and was understood by others. During his examination, Sklar found D.T.'s communication was good. Jennifer Henkhaus also noted D.T. was completely intelligible and logical. Substantial evidence in the record supports the ALJ's determination that D.T.'s impairments did not seriously interfere with his ability to interact and relate with others.

### VI. RECOMMENDATION

In his decision, the ALJ found D.T. had, at worst, a marked limitation in acquiring and using information because of his borderline intellectual functioning and syntax disorder. As noted above, D.T. also had a marked limitation in his ability to complete tasks. Because D.T. had marked limitations in two functional domains, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded for an award of benefits under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

        /S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 15, 2008.